**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
Michael D. Sirota, Esq.
Warren A. Usatine, Esq.
Ryan T. Jareck, Esq.
Nicholas B. Vislocky, Esq.
(201) 489-3000
(201) 489-1536 Facsimile
Proposed Attorneys for RIH Acquisitions NJ, LLC, *et al.*,
Debtors-in-Possession

|  | UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY CASE NO. 13- |
|---|---|
|  | Chapter 11 (Joint Administration Pending) |
| In re: RIH ACQUISITIONS NJ, LLC, *et al.*,[1] Debtors-in-Possession. | **AFFIDAVIT OF ERIC MATEJEVICH IN SUPPORT OF DEBTORS' "FIRST DAY MOTIONS" AND REQUEST FOR ENTRY OF EMERGENCY INTERIM ORDER AUTHORIZING THE DEBTORS TO SATISFY AND, TO THE EXTENT APPLICABLE, DIRECTING ANY PAYROLL BANKS TO HONOR CERTAIN PRE-PETITION GROSS SALARIES AND PAYROLL TAXES FOR THEIR EMPLOYEES** |

STATE OF NEW JERSEY   )
                     ) SS.
COUNTY OF ATLANTIC   )

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal identification number are: RIH Acquisitions NJ, LLC d/b/a The Atlantic Club Casino Hotel (1695) and RIH Propco NJ, LLC (5454).

51328/0001-8964916v6

ERIC MATEJEVICH, of full age, being duly sworn according to law, upon his oath, deposes and states:

1.      I am the Co-Chief Operating Officer of RIH Acquisitions NJ, LLC ("**RIH Acquisitions**") d/b/a The Atlantic Club Casino Hotel (the "**Atlantic Club Casino**"), a New Jersey limited liability company and one of the Debtors.[2]  I have served as RIH Acquisitions' Co-Chief Operating Officer since December 28, 2011.  I also am the Chief Financial Officer of Resorts International Holdings, LLC, the parent company of RIH Acquisitions, and have served in that role since September 2004.

2.      I am fully familiar with the Debtors' business and financial affairs and the Atlantic Club Casino's day-to-day operations, and am duly authorized to make this affidavit on the Debtors' behalf.[3]  I submit this affidavit (a) in support of the Debtors' petitions for relief under Chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), (b) to assist the Court and other interested parties in understanding the circumstances giving rise to the commencement of these Chapter 11 cases, and (c) to provide general information about the Debtors and the Atlantic Club Casino's business operations that are germane to the form of motions and applications that the Debtors have requested of the Court (the "**First Day Motions**").  I have reviewed the First Day Motions or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to the uninterrupted operation of the Atlantic Club Casino's business and to the Debtors' restructuring efforts.

---

[2] Michael Frawley is the other Co-Chief Operating Officer of RIH Acquisitions.

[3] The factual statements in this affidavit are based on my personal knowledge, information supplied to me by others under my supervision, my review of relevant documents, and my experience and knowledge of the Atlantic Club Casino's operations and the Debtors' financial condition.

2

3. Part I of this Affidavit provides an introduction to the Debtors and their Chapter 11 cases. Part II provides an overview of the Debtors' organizational and capital structure, the Atlantic Club Casino's business operations and the pre-petition efforts to sell the Atlantic Club Casino. Part III describes the circumstances giving rise to the commencement of these Chapter 11 cases. Part IV sets forth the relevant facts in support of the First Day Motions.

## I.  INTRODUCTION

4. On November 6, 2013 (the "**Filing Date**"), the Debtors filed voluntary petitions for relief pursuant to Chapter 11 of the Bankruptcy Code. Since the Filing Date, the Debtors have remained in possession of their assets – and RIH Acquisitions continues management of its business – as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

5. The Debtors' cases have been initiated to effectuate a sale of substantially all of RIH Acquisitions' assets under Section 363 of the Bankruptcy Code. The Debtors believe a prompt sale is necessary to maximize the value of RIH Acquisitions' assets, as the Atlantic Club Casino is not generating sufficient cash flow to continue their ordinary course operations.

6. In 2005, RIH Acquisitions was formed to own and operate the Atlantic Club Casino, which it acquired from Caesars Entertainment Inc. ("**Caesars**") and Harrah's Entertainment Inc. ("**Harrah's**"). At that same time, three affiliates of RIH Acquisitions acquired a casino in East Chicago, Indiana and two casinos in Tunica, Mississippi from Caesars and Harrah's. Those affiliates, along with RIH Acquisitions and its subsidiary RIH Propco NJ LLC ("**RIH Propco**"), were co-borrowers of the Loan (as discussed below) that financed the casino purchases.

7. In 2007, one of the non-debtor entities divested the East Chicago, Indiana casino property. Thereafter, starting in mid-2009, RIH Acquisitions, RIH Propco, and the affiliates that

3

owned the Tunica, Mississippi casinos spent the better part of two years actively addressing their financial condition with their principal lenders in an attempt to formulate a comprehensive debt restructuring plan. The borrowers intended that such a debt restructuring plan, together with the implementation of cost savings initiatives, would provide them with a sustainable capital structure.

8. Based on those restructuring discussions, RIH Acquisitions and RIH Propco, in consultation with their advisors, determined that a sale of the Atlantic Club Casino was in their long-term best interests. In January 2011, RIH Acquisitions and RIH Propco entered into a standstill agreement pursuant to which their lenders agreed to forbear while the Debtors attempted to find a buyer for the Atlantic Club Casino. Unfortunately, due to the Atlantic Club Casino's financial performance and adverse market conditions, RIH Acquisitions and RIH Propco were unable to reach agreement with a viable purchaser.

9. In October 2011, after being unable to find a purchaser, RIH Acquisitions, RIH Propco, and their affiliates that owned the Tunica, Mississippi casinos, in consultation with the New Jersey Casino Control Commission and the City of Atlantic City, reached an agreement with their pre-petition secured lenders. Pursuant to that agreement, RIH Acquisitions retained ownership of the Atlantic Club Casino debt free, while the entities that owned the Tunica, Mississippi casinos transferred ownership of those casinos to the prepetition lenders in full satisfaction of those lenders' claims. That agreement was finalized on November 28, 2011.

10. During 2012, the Debtors continued to market their assets as a sale of the Atlantic Club Casino continued to be in their long-term best interests. On December 21, 2012, Resorts International Holdings, LLC ("**Resorts International**"), the parent company of RIH Acquisitions, entered into a Membership Interest Purchase Agreement (the "**Purchase**

**Agreement**") with Rational Group US Holdings Inc. and Oldford Group Limited (collectively, "**Rational**"). Pursuant to the Purchase Agreement, at closing, Rational would have acquired 100% of the outstanding membership interests of RIH Acquisitions. The closing of the transaction was subject to the satisfaction of certain conditions, including receipt of approvals from New Jersey state regulatory authorities and other customary closing conditions.

11. The Purchase Agreement was terminated by Resorts International in accordance with its terms on April 27, 2013 as a result of Rational's failure to secure casino licensing. On May 6, 2013, Rational filed suit against, among others, Resorts International[4] to prevent the termination of its rights under the Purchase Agreement and was granted a temporary restraining order preventing RIH Acquisitions from entering into negotiations with other potential buyers. That temporary restraining order was lifted by the Superior Court of New Jersey on May 17, 2013.

12. Since that time, RIH Acquisitions has been actively seeking an alternative buyer for its assets. Although some parties engaged in due diligence, no party submitted a formal indication of interest to acquire the Atlantic Club Casino prior to the commencement of these Chapter 11 cases.

13. RIH Acquisitions currently does not have sufficient cash resources or committed financing to operate the Atlantic Club Casino and service ordinary course obligations for an extended time period. Moreover, the Debtors believe prospective buyers of their assets would be reluctant to engage in a financing transaction and/or asset sale transaction absent the protections available under Chapter 11. Accordingly, and after consultation with their advisors, the Debtors

---

[4] As set forth below, in addition to Resorts International, Rational filed suit against myself, Michael Frawley, Irwin Apartment Trust, RIH Acquisitions and RIH PropCo in the Superior Court of New Jersey, Chancery Division – Atlantic County.

ultimately determined the best course of action would be to commence Chapter 11 cases, secure DIP financing and implement a marketing and auction process that ultimately will lead to a sale of substantially all the Debtors' assets to a third-party.

## II. FACTUAL BACKGROUND

### A. The Debtors' Business

14. RIH Acquisitions is in the hotel and gaming business and owns and operates the Atlantic Club Casino (formerly The Atlantic City Hilton and ACH)[5] located at Boston Ave. & The Boardwalk in Atlantic City, New Jersey. The Atlantic Club Casino has 801 hotel rooms, over 75,000 square feet of casino gaming space, including state-of-the-art low denomination slots and table games, as well as seven restaurants. The property also offers over 37,000 square feet of versatile event space and can accommodate gatherings of up to 1,600 people. The Atlantic Club Casino sits on a 28.22 acre master planned site.

15. RIH Acquisitions reports for financial purposes on a calendar year basis. For the year ended December 31, 2012, RIH Acquisitions generated net revenue of approximately $103,789,000, which resulted in a net loss of approximately $43,265,000.

16. As of the Filing Date, RIH Acquisitions has approximately 1,660 employees. RIH Acquisitions is a party to four collective bargaining agreements, covering approximately 43% of its employees.

17. As detailed above, RIH Propco is a wholly owned subsidiary of RIH Acquisitions. RIH Propco has no assets or liabilities, other than as a party to a unitary lease with RIH

---

[5] In 2011, RIH Acquisitions' license agreement for use of the Hilton Hotels & Resorts ("**Hilton**") name was not renewed. As such, the hotel rebranded itself as ACH as it had until December 31, 2011 to remove the Hilton name on all areas of the property and promotions. Subsequently, on March 13, 2012, ACH was renamed The Atlantic Club Casino Hotel.

Acquisitions. Pursuant to that lease, all the real estate associated with the Atlantic Club Casino, as well as its non-gaming furniture, fixtures and equipment, are leased by RIH Acquisitions to RIH Propco, and leased back by RIH Propco to RIH Acquisitions.

### B.   The Debtors' Pre-Petition Capital Structure

(i)   The November 2011 Restructuring

18.   RIH Acquisitions commenced operations on April 26, 2005, when it acquired most of the assets and assumed certain liabilities of The Atlantic City Hilton from Caesars and Harrah's. On that same date, affiliates of RIH Acquisitions acquired (also from Caesars and Harrah's), Harrah's East Chicago, Resorts Casino Tunica and Bally's Casino Tunica. In October 2006, RIH Acquisitions, RIH Propco, and the entities that acquired the East Chicago and Tunica casinos refinanced their capital structure and entered into a loan agreement with U.S. Bank, National Association, as Trustee for the Benefit of the Holders of J.P. Morgan Chase Commercial Mortgage Securities Corp, Commercial Mortgage Pass-Through Certificates, Series 2007-FL1, and for the Holders of Non-Trust Partition Interests ("**JPMorgan**") to borrow a principal amount of $960 million (the "**Loan**"). RIH Acquisitions pledged substantially all its assets as collateral for the Loan.[6]

19.   The Loan originally was to mature November 9, 2008 and included the option to extend the term of the Loan for three successive one year terms. In November 2008, the borrowers exercised their option to extend the term of the Loan for one year. In July 2009, however, the borrowers defaulted on the Loan as a result of their failure to make monthly interest payments.

---

[6] In 2007, Resorts International sold the East Chicago casino to Ameristar Casinos, which changed its name to Ameristar Casino Hotel East Chicago in September 2008. The Loan was partially paid down from the sale of East Chicago and releases with respect to that collateral were executed in order to close on the sale.

7

20. On January 18, 2011, the borrowers entered into a standstill agreement (the "**Standstill Agreement**") with JPMorgan. The Standstill Agreement provided for a forbearance period during which the parties would cooperate to find a buyer for the Atlantic Club Casino. Shortly thereafter, the lenders retained a financial advisory firm to find a buyer on terms agreeable to all parties.

21. In October 2011, after being unable to find a satisfactory buyer for the Atlantic Club Casino, the borrowers and JPMorgan, in consultation with the New Jersey Casino Control Commission and the City of Atlantic City, reached an agreement whereby RIH Acquisitions would retain ownership of the Atlantic Club Casino debt free. As part of that agreement, ownership of Resorts Casino Tunica and Bally's Casino Tunica in Tunica, Mississippi, was transferred to JPMorgan in full satisfaction of the Loan, which at that point had a balance of approximately $501 million. That agreement became effective on November 28, 2011.

22. Also as part of that settlement, Resorts International made an equity contribution of $15 million to RIH Acquisitions, and JPMorgan agreed to release $9.3 million of business interruption insurance proceeds related to an August 2009 claim for flood damage at the Atlantic Club Casino. Those funds were used, among other things, for capital investments in the Atlantic Club Casino including new slot machine products, a remodeled casino floor and new restaurants and related amenities.

(ii)    Tax Lien Certificates

23. RIH Acquisitions is an obligor with respect to unpaid real estate taxes associated with the Atlantic Club Casino. I am advised that the unpaid obligations are a continuous lien with respect to the Atlantic Club Casino property. See N.J.S.A. § 54:5-6.

24. In early 2011, the City of Atlantic City monetized those liens through the sale of tax certificates to Tower Lien LLC ("**Tower Lien**") and FNA Jersey BOI LLC ("**FNA Jersey**"), which tax certificates are secured by the Atlantic Club Casino. See N.J.S.A. § 54:5-9. I am advised that every municipal lien is a senior lien on the subject land and paramount to all prior or subsequent encumbrances thereon, except subsequent municipal liens. See id. The tax lien certificates held by Tower Lien were satisfied by RIH Acquisitions' May 23, 2012 settlement with the City of Atlantic City concerning a multi-year tax appeal. FNA Jersey, however, is still the holder of a tax lien certificate (Certificate No. 11-00028) in the face amount of $3,134,401.27 that was recorded on February 23, 2012. As of October 31, 2013, the amount owed with interest and penalties to FNA Jersey is approximately $5.7 million. FNA Jersey, as the holder of a tax lien certificate, has a first lien position with respect to the Atlantic Club Casino.

    (iii)    <u>Capital Leases</u>

25. RIH Acquisitions has financed certain equipment purchases through the use of capital leases with expiration dates ranging from August 2013 to May 2014. The lessors include, among others, Bally Technology, Inc., International Game Technology and Konami Gaming, Inc. The outstanding balance owed under those capital leases was $1,739,420 as of May 1, 2013.

    (iv)    <u>Other Unsecured Debt</u>

26. As of September 30, 2013, RIH Acquisitions had approximately $9 million in accounts payable and approximately $16.6 million in accrued expenses on its balance sheet.

**C.**    **<u>The Debtors' Extensive Efforts to Sell the Atlantic Club Casino</u>**

27. Following the November 2011 restructuring, RIH Acquisitions retained Imperial Capital, LLC ("**Imperial**") to act as its financial advisor and investment banker with respect to a potential re-marketing of RIH Acquisitions' business. Over the course of an approximately four-month period, Imperial engaged in extensive marketing activity. During the initial stages of

the marketing process, Imperial prepared a "buyer's list" identifying prospective financial and strategic buyers for the Atlantic Club Casino. Imperial also prepared, and in July 2012, began sending communications to the various prospective buyers advising them of the opportunity to acquire the Atlantic Club Casino (the "**Solicitation**").

28. Through the Solicitation, Imperial estimates that it contacted approximately 120 potential bidders, 12 of which negotiated confidentiality agreements entitling them to access to due diligence information. From early August 2012 through September 2012, those parties reviewed due diligence materials, conducted site visits and met with management in connection with the investment opportunity. Unfortunately, none of the parties that engaged in due diligence as part of that process submitted a formal indication of interest to acquire the Atlantic Club Casino.

D. **The Purchase Agreement With Rational**

29. In or about September 2012, RIH Acquisitions' management became convinced that the prospect of online gaming presented an opportunity for the Atlantic Club Casino, and has since supported the passage of legislation in New Jersey that would permit online gaming. RIH Acquisitions management also became aware around the same time that PokerStars, a company which operated international online poker rooms and tournaments, was interested in entering the Atlantic City gaming market. In an initial discussion between myself and PokerStars' founder, Isai Scheinberg ("**Scheinberg**"), in October 2012, Scheinberg expressed interest in a potential acquisition of the Atlantic Club Casino.

(i) The Term Sheet

30. On November 7, 2012, following more than a month of negotiations, Resorts International, a non-Debtor, and Rational Entertainment Ventures Limited ("**REVL**"), a company formed by PokerStars, executed a term sheet (the "**Term Sheet**") providing for the sale

10

of 100% of the membership interests in RIH Acquisitions to REVL. The Term Sheet called for REVL to pay cash advances that were to be used to fund operations while due diligence and negotiations toward a final purchase agreement continued. Under the Term Sheet, if a purchase agreement was signed, the advances were to be applied against the purchase price. Resorts International was willing to attempt to complete a sale of the Atlantic Club Casino to the PokerStars affiliate because PokerStars represented its legal problems with the United States government were largely resolved. REVL also expressed a willingness to commit necessary cash advances to fund operating deficits, and agreed to an expeditious timetable for consummating the transaction.

31. Importantly, during the negotiations of the Term Sheet and the Purchase Agreement that followed, both sides were represented by sophisticated and experienced corporate and regulatory counsel. The allocation or risk relating to the receipt of the required regulatory approval was very much a subject of negotiation. In view of the historical regulatory issues PokerStars had faced, the financial condition of the Atlantic Club Casino, and the impending onset of online gaming, it was critical to have a termination provision that set a date after which the Purchase Agreement could be terminated if the transaction had not been completed. Such a provision would allow Resorts International and RIH Acquisitions sufficient time to pursue other alternatives if PokerStars was unable to get licensed in a timely manner.

32. Although the Term Sheet was executed on November 7, 2012, negotiations toward a definitive purchase agreement lagged through November and into December 2012. On December 20, 2012, the New Jersey Senate passed the pending bill to legalize online gaming. The following day, Resorts International executed the Purchase Agreement with Rational, another company affiliated with PokerStars.

11

(ii) The Execution and Subsequent Termination of the Purchase Agreement

33. The Purchase Agreement contained a specific provision governing the closing of the transaction, which was consistent with the parties' agreement to an expeditious transaction. In short, the Purchase Agreement incorporated a provision that gave each party the right to terminate the transaction if such transaction did not close on or before the mutually agreed date of April 26, 2013. Additionally, the parties agreed Rational would not be refunded the advances it made under the Purchase Agreement and would be required to pay a $4,000,000 termination payment in the event the transaction was terminated other than due to a breach of the Purchase Agreement by the Debtors.

34. On December 24, 2012, Rational filed its initial application for interim casino authorization ("**ICA**"). In March 2013, the press widely reported that the American Gaming Association ("**AGA**") had filed a brief with the Casino Control Commission ("**CCC**") opposing Rational's application for ICA. The AGA brief raised significant issues about Rational's suitability in light of its association with PokerStars. The information in the AGA brief concerning the extensive criminal activities of PokerStars and its principals was disturbing and caused serious concern on the part of Resorts International and RIH Acquisitions about Rational's ability to obtain ICA.

35. That concern was exacerbated by a telephone conversation I had with representatives of the Division of Gaming Enforcement ("**DGE**") in March 2013. Based on that conversation, I advised Rational via letter on March 26, 2013 that it was my impression that the DGE would likely not issue its report on the ICA approval process until July or August 2013.

36. Rational was unable to consummate the transaction on or prior to April 26, 2013 due to its failure to receive the required ICA approval by such date. Faced with the prospect of a

Case 13-34483-GMB    Doc 17    Filed 11/07/13    Entered 11/07/13 11:03:14    Desc Main

continued lengthy regulatory process with an uncertain outcome, Resorts International exercised the termination right under the Purchase Agreement. Rational was obligated to pay a $4 million termination payment by April 30, 2013 but failed to do so. Instead, on April 30, 2013, Rational sent a letter threatening to tie up the Atlantic Club Casino property in litigation should the Debtors exercise their rights under the Purchase Agreement.

37. Rational, among others, commenced an action against myself, Michael Frawley, Irwin Apartment Trust, Resorts International, RIH Acquisitions and RIH PropCo (collectively, the "**Defendants**") in the Superior Court of New Jersey, Chancery Division – Atlantic County, Case No. ATL-C-43-13. Rational alleged Defendants breached the Purchase Agreement and engaged in conduct that violated the implied covenant of good faith and fair dealing, including by allegedly improperly terminating the Purchase Agreement. Rational further asserted claims for reformation of the Purchase Agreement, promissory estoppel, impracticability, equitable lien resulting trust, and unjust enrichment. Simultaneously with filing the Verified Complaint, Rational made an application for an *ex parte* temporary restraining order ("**TRO**") and for preliminary injunctive relief along the lines pled in the Verified Complaint. On May 6, 2013, Rational received a temporary restraining order on an *ex parte* basis with no notice to the Defendants.

38. On May 17, 2013, the Superior Court of New Jersey lifted the TRO finding that Rational's failure to obtain licensing approval from New Jersey gaming regulators within the timeline specified in the Purchase Agreement entitled the Debtors to terminate the Purchase Agreement and keep the funds advanced to them by PokerStars.

39. On June 10, 2013, Rational filed a motion for leave to appeal the trial court's ruling denying the TRO. On June 19, 2013, the Debtors opposed the motion for leave to appeal.

On June 28, 2013, the Superior Court of New Jersey, Appellate Division, denied the Plaintiffs' motion for leave to appeal the trial court's ruling denying the TRO.

40. On July 17, 2013, the DGE announced it had received a letter from Rational stating that Rational was withdrawing its petition for ICA and no longer seeking to acquire RIH Acquisitions. The litigation is continuing, but is now limited to monetary damages. Rational is seeking an order requiring RIH Acquisition to return the $11 million that was funded towards the $15 million purchase price. Resorts International is seeking the $4 million termination payment be turned over.

41. Since the termination of the Purchase Agreement, RIH Acquisitions and its advisors have been actively seeking an alternative buyer for its assets. Although some parties engaged in due diligence, no party submitted a formal indication of interest to acquire the Atlantic Club Casino prior to the commencement of these Chapter 11 cases.

### III.     FACTORS THAT PRECIPITATED THE DEBTORS' CHAPTER 11 FILING

42. RIH Acquisitions' financial performance continues to be hampered by the weak Atlantic City gaming market, which continues to be adversely affected by a sluggish economic recovery and the impact of the newly opened casino facilities in Pennsylvania and New York. RIH Acquisitions has also suffered from deteriorated brand recognition by the loss of its license agreement with Hilton. Those factors, among others, have contributed to the Debtors' desire to pursue a sale of substantially all their assets pursuant to Section 363 of the Bankruptcy Code.

**A.     Adverse Market Conditions**

43. For the first time since the opening of the first casino in 1970, Atlantic City's gaming industry, which is the second largest gaming market in the United States, began to suffer a decline in annual revenue in 2007. Based upon filings with the New Jersey Division of Gaming Enforcement, total Atlantic City casino win fell 12.9% in September 2013 to $240

14

million. Slot machine win fell 10.6%, to $177 million. Table game win decreased by 18.9%, to $63 million. For the first nine months of 2013, casinos won $2.2 billion which is down 9.3% from the same period in 2012.

### B. RIH Acquisitions' Recent Financial Performance

44. RIH Acquisitions' financial performance has been adversely impacted by the challenging Atlantic City gaming market described above. In an effort to combat those market challenges, and in an attempt to rebuild recognition in the marketplace following the loss of its license agreement with Hilton, in early 2012, RIH Acquisitions rebranded the Atlantic Club Casino with a new name and a new marketing strategy that targeted local customers through a variety of low-cost gambling attractions and new restaurants. The Atlantic Club Casino now targets gamblers throughout South Jersey as the foundation for its customer base. The strategy includes partnering with local businesses to allow the casino's customers to redeem their comp points for goods and services at those shops.

45. The rebranding campaign focused on the cost-conscious gamblers who prefer penny slot machines and low-stakes table games. As part of that campaign, RIH Acquisitions embarked on a $12.5 million renovation project including a remodeled casino floor that features new penny slot machines and an assortment of table games that have low stakes, mainly $5 and $10 minimum bets. The number of slot machines was reduced from approximately 1,800 to 1,500 and the number of table games was reduced from 86 to 50 as part of plans to make the gaming floor more attractive. Currently, about 70 percent of the casino floor is dedicated to penny slots.

46. As a result of those efforts, RIH Acquisitions has seen improvements in revenue and operating performance. Despite those improvements, however, the Debtors continue to experience losses and liquidity issues resulting therefrom. For the first nine months of 2013,

15

revenue at the Atlantic Club Casino of approximately $88,585,255 resulted in a negative EBITDA of $7,373,838.

### IV.     THE PURPOSE OF THE CHAPTER 11 FILING

47.     The Debtors' management and board of directors, along with their advisors, have evaluated various restructuring options and determined that the best way to maximize the Debtors' going concern value for the benefit of all stakeholders was to commence these Chapter 11 cases and pursue a sale of substantially all the Atlantic Club Casino's assets pursuant to Section 363 of the Bankruptcy Code. The Debtors intend to finance ongoing operations of the Atlantic Club Casino during these Chapter 11 cases and contemplated Section 363 sale process through a post-petition DIP facility, which will be provided pursuant to a DIP credit agreement (as more fully described in the Verified Application in Support of Debtors' Motion for an Order Authorizing the Borrowing Under A Debtor-In-Possession Financing Facility Pursuant to 11 U.S.C. § 364 filed contemporaneously herewith (the "**DIP Motion**")).

48.     In addition to the DIP Motion, to avoid the potentially disruptive impact the commencement of these Chapter 11 cases might have on the Atlantic Club Casino, to facilitate the Debtors' orderly transition into Chapter 11 and to maintain going concern value of the Atlantic Club Casino and the Debtors' assets while a sale is pursued, the Debtors have requested the Court to consider, on an expedited basis, the following substantive First Day Motions:

(a)     Verified Application in support of the Debtors' motion for an Order: (a) authorizing RIH Acquisitions NJ, LLC to continue using its existing cash management system; (b) authorizing certain Debtors to continue using their bank accounts and business forms; and (c) waiving the Debtors' compliance with investment guidelines under 11 U.S.C. § 345(b);

(b)     Verified Application in support of the Debtors' motion for an Order: (i) authorizing RIH Acquisitions NJ, LLC to (A) satisfy and, to the extent applicable, directing any payroll banks to honor, pre-petition gross salaries, payroll taxes and related obligations to or for the benefit of the Debtors' employees, and (B) honor, in its discretion, pre-petition sick,

vacation, personal, and similar themed days; and (ii) granting other related relief;

(c) Verified Application in support of the Debtors' motion for entry of an order authorizing RIH Acquisitions NJ, LLC to pay certain pre-petition taxes and fees pursuant to 11 U.S.C. §§ 507(a)(8) and 105(a);

(d) Verified Application in support of the Debtors' motion pursuant to 11 U.S.C. § 105(a) for an Order authorizing RIH Acquisitions NJ, LLC to honor casino chips and other customer-related claims, programs and obligations;

(e) Verified Application in support of the Debtors' motion for entry of: (i) an interim Order authorizing RIH Acquisitions NJ, LLC to pay or honor prepetition obligations to certain critical vendors and authorizing financial institutions to honor all related checks and electronic payment requests related thereto; and (ii) a final Order;

(f) Application in support of the Debtors' motion for an Order directing the credit card processor to honor the processing agreement with RIH Acquisitions NJ, LLC pending assumption or rejection pursuant to 11 U.S.C. §§ 365 and 105(a);

(g) Application in support of the Debtors' motion for an order: (a) granting interim relief pursuant to 11 U.S.C. § 366(b); (b) authorizing the payment of adequate assurance for post-petition utility services; (c) fixing final hearing date to determine adequate assurance; and (d) granting other related relief;

(h) Application in support of the Debtors' motion for an interim and final order: (i) authorizing the Debtors to obtain superpriority, senior secured post-petition financing pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c) and 364(e); (ii) scheduling a final hearing pursuant to Fed. R. Bankr. P. 4001; and (iii) granting other related relief;

(i) Verified Application in support of the Debtors' motion for an Order authorizing RIH Acquisitions NJ, LLC to continue making installment payments under a prepetition insurance premium financing agreement;

(j) Application in support of the Debtors' motion for an order authorizing RIH Acquisitions NJ, LLC's retention and compensation of non-legal professionals utilized by it in the ordinary course of business *nunc pro tunc* to the filing date;

(k) Application in support of the Debtors' motion for an Order authorizing the retention and compensation of non-bankruptcy legal professionals *nunc pro tunc* to the filing date; and

51328/0001-8964916v6

(l) Application in support of the Debtors' motion for an Order approving the Debtors' retention of Kurtzman Carson Consultants LLC as claims and noticing agent pursuant to 28 U.S.C. § 156(c).

49. The purposes of the First Day Motions include, among other things, to: (a) enable RIH Acquisitions to operate effectively, ease the Debtors' transition into Chapter 11 and mitigate potentially adverse effects of the Chapter 11 filings; (b) minimize disruption of RIH Acquisitions' ability to continue providing quality service to its customers and, thus, preserve the customers' confidence and ensure their continued patronage; (c) maintain and bolster employee morale so as to reduce employee attrition during the Debtors' Chapter 11 proceedings, which would have a detrimental impact on RIH Acquisitions' business and customer service; and (d) maintain vital vendor relationships. Each of the First Day Motions is crucial to the Debtors' restructuring and sale efforts and preservation of the Debtors' assets and estates.[7]

50. In light of their challenging financial position, the Debtors' paramount goal is to maximize the recovery of their creditor constituencies and other stakeholders. Following careful consideration of all alternatives, the Debtors have determined that the contemplated Section 363 sale process, financed pursuant to a DIP loan on the terms set forth in the DIP Motion, is the best way to maximize the value of the Debtors' business. The Debtors anticipate that they will complete an auction and sale of substantially all their assets in the near term and will close on the sale following satisfaction of certain conditions, including receipt of approvals from New Jersey regulatory authorities. Implementing the sale will ensure the Debtors' business continues as a going concern, enabling the Atlantic Club Casino to emerge from Chapter 11 as a healthy, viable

---

[7] For a more detailed description of the First Day Motions, the Debtors respectfully refer the Court and parties-in-interest to the respective First Day Motions.

51328/0001-8964916v6

enterprise and maximizing the value of the Debtors' estates while minimizing disruption to employees, vendors, and customers.

## V. THE NEED FOR EMERGENT RELIEF REGARDING PAYROLL CHECKS

51. Due to the timing of these Chapter 11 filings, the Debtors respectfully request entry of an emergency interim order authorizing RIH Acquisitions to satisfy and, to the extent applicable, directing any payroll banks to honor certain pre-petition gross salaries and payroll taxes for its employees (the "**Emergency Interim Order**") submitted herewith. As set forth in the Payroll Motion,[8] payroll checks were distributed on Monday, November 4, 2013 to those employees who do not receive direct deposit for the Non-Executive Payroll (as defined in the Payroll Motion) cycle, covering the seven day period for the week ended Sunday, October 27, 2013 (the "**November 4th Payroll**"). Given the possibility that some of those checks might not have cleared or might not be presented until after the Filing Date, and the possible need for the employees to be able to cash their payroll checks before the hearing on the First Day Motions, the Debtors respectfully request that the Court enter the Emergency Interim Order to ensure that any payroll banks presented with the November 4th Payroll checks honor those checks.

## VI. CONCLUSION

52. The First Day Motions will enable RIH Acquisitions to stabilize and continue its operations in the ordinary course while the Debtors seek to sell their assets pursuant to Section 363 of the Bankruptcy Code. Accordingly, the Debtors respectfully request that the Court enter Orders granting the First Day Motions and further grant the Emergency Interim Order.

---

[8] The "Payroll Motion" refers to the Verified Application is submitted in support of the Debtors' motion for an Order: (i) authorizing RIH Acquisitions to (A) satisfy and, to the extent applicable, directing any payroll banks to honor pre-petition gross salaries, payroll taxes and related obligations to or for the benefit of the Debtors' employees, and (B) honor, in its discretion, pre-petition sick, vacation, personal, and similar themed days; and (ii) granting other related relief.

_____
ERIC MATEJEVICH

Sworn and subscribed to
before me this 6th day of
November, 2013

_____
Nicholas B. Vislocky, Esq.
Attorney-at-law for the State
of New Jersey